IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES MICHAEL THOMAS, JR., : |  |
| Plaintiff : |  |
| : |  |
| vs. : | CIVIL NO. 1:CV-13-0670 |
| : |  |
| CAROLYN W. COLVIN, Acting : | (Judge Caldwell) |
| Commissioner of Social Security : |  |
| Defendant : |  |
| : |  |

*M E M O R A N D U M*

I. *Introduction*

Pursuant to 42 U.S.C. § 405(g), plaintiff, Charles Michael Thomas, Jr., seeks review of a decision denying him disability insurance benefits, 42 U.S.C. §§ 401-433, and supplemental security income, 42 U.S.C. §§ 1381-1383f, under the Social Security Act. The defendant is Carolyn W. Colvin, the Acting Commissioner of Social Security.[1]

Plaintiff claims to be disabled based on degenerative disc disease at the L5-S1 level and radiculopathy. (Tr. 53).[2] He filed his application for benefits on April 26, 2009, (Tr. 20), alleging a disability onset date of September 30, 2007. (Tr. 50). On April 8, 2011, a hearing was held (Tr. 47), and on November 23, 2011, the administrative law

---

[1] The case had been brought against Michael Astrue, the former Commissioner. Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), Colvin is substituted as the defendant.

[2] References to "Tr. ___" are to pages of the administrative record (Doc. 8) Defendant filed on May 20, 2013.

judge (ALJ) denied benefits. (Tr. 40-41). On January 17, 2013, the Appeals Council denied a request for review. (Tr. 1).

In this action, Plaintiff claims the ALJ erred in the following ways. First, the ALJ relied on her own lay opinion of the medical evidence rather than on the opinions of the medical professionals appearing in the record. Second, the ALJ did not identify the medical evidence she relied on in reaching her conclusion Plaintiff was not disabled. Third, the ALJ did not give proper weight to the opinion of Dr. Saira Bano, Plaintiff's treating physician concerning Plaintiff's limitations.

II. *Background*

   A. *Function Report*

In an undated Function Report filled out before his hearing, Plaintiff described the following daily activities. When he gets up in the morning, he sits until the tingling subsides and then tries to walk around as much as he can. (Tr. 265). He is able to care for the family pets. (Tr. 266). He watches television and works on cars, but not too much as lifting and "torqueing" hurts his lower back. (Tr. 269). He can drive a car and make simple meals and do dishes once a week. (Tr. 267). He cannot play with his children as much as he would like because of hip pain. (Tr. 270). He will sit and visit with other people and go to the post office regularly. (Tr. 269).

B. *Plaintiff's Testimony at the Administrative Hearing*

At the hearing on his disability application, Plaintiff testified as follows, in pertinent part. His last full-time job was in 2007, working for Pennsylvania Pellets, running the crane, picking logs up and putting them on the conveyor belt. (Tr. 56). He did not personally have to lift any significant weight. (Tr. 57). He spent eight hours a day in the cab of the crane except for two fifteen-minute breaks. (Tr. 57).

In 2008, he worked part-time (twenty hours per week) for Hoopes Turf Farm for about a month and a half doing maintenance work on trucks, such as changing the oil and greasing them. (Tr. 58). He had to slide under the truck to do this work. (Tr. 58-59). He had difficulty getting up and down to go under the truck. (Tr. 59). He would sometimes lose his balance when he got into the cab to move a truck. (Tr. 60). This job ended when "another guy . . . came back." (Tr. 59).

In 2008-2009, he worked for Hart Construction. He helped build a garage and was mainly the saw man, using a jigsaw. He carried two-by-fours, about five pounds at a time. (Tr. 60-61). The job was part-time and lasted about a month and a half, ending when the garage was finished. (Tr. 61). Plaintiff was not given any special accommodations and had no difficulty with the work. (Tr. 61).

In 2009-2010, Plaintiff had pain going down his left leg, numbness in the foot, and back spasms. (Tr. 75, 78). The numbness began in January 2010. (Tr. 75). The pain and numbness are constant. (Tr. 76, 83). The numbness throws him off balance. (Tr. 83). Occasionally, his right foot will go numb, at its worst about four times a

week for maybe two to three hours.  (Tr. 83-84).  Plaintiff received three sets of injections but they gave him no relief and no increased ability to exert himself.  (Tr. 76).  He began using a TENS unit in July 2009 but this also offered him no relief.  (Tr. 77).  Neither did physical therapy.  (Tr. 84).  Plaintiff continued to work until January 2010 when "the doctor finally took him off work."  (Tr. 77).

Plaintiff's walking is affected by the back spasms and left-foot numbness. (Tr. 78).  He has back spasms four or five times a day lasting from ten to twenty minutes at a time.  (Tr. 78).  The spasms increase with physical exertion, such as walking from one side of the room to the other.  (Tr. 79).  The pain is focused on the lower left side of his back.  (Tr. 78-79).  The affected area gets warm and swells to about the size of half a grapefruit.  (Tr. 79).  He must lie down when he gets the spasms.  (Tr. 80).  He gets back spasms all the time, sitting, standing or walking.  (Tr. 80).

Plaintiff is no longer able to climb into and out of a truck and had difficulty doing that before when he was working.  (Tr. 81).  When he reaches up, it feels like a screwdriver is being tightened into his left lower back.  (Tr. 81-82).

On a typical day, Plaintiff's pain level is a seven on a scale of one to ten. (Tr. 89).  It is never any lower than this and sometimes goes to eight or nine three to four times a day, even with medication.  (Tr. 89-90).  Plaintiff can sit for about fifteen to twenty minutes before having to stand.  (Tr. 91).  In 2007, Plaintiff could sit for about an hour or so, his pain level was at four.  (Tr. 91).  Plaintiff can stand for about fifteen minutes now, but in 2007 could stand for about an hour.  (Tr. 92).  Plaintiff can walk about ten minutes

now, but in 2006 could walk about a half hour. (Tr. 92). Plaintiff cannot stoup or bend now but in 2007 could do so. (Tr. 92). Now he can sit for a total of three hours in an eight-hour day, but in 2007 he could do so for five hours. (Tr. 92-93). The total amount of time he could comfortably stand and walk in an eight-hour day is one hour. (Tr. 93).

In regard to daily activities, Plaintiff's wife does the grocery shopping and all household chores. (Tr. 87). Plaintiff cannot do the dishes or the cooking because of his back spasms and leg pain. (Tr. 87). He cannot attend his child's school functions because he has to drive there. (Tr. 88). He does not go to movies, restaurants or social events. (Tr. 88). He lies down for an hour to a hour and a half three times a day to relieve the pressure on his back. (Tr. 88). He cannot be more active afterwards. (Tr. 89). He has difficulty rising from a sitting to a standing position and cannot bend at the waist to pick something up off the floor because of the pain in his back and leg. (Tr. 89). He uses tables and chairs to keep his balance when walking around his house. (Tr. 89).

C. *Medical History*

Plaintiff receives his primary health care from Emporium Health Center, with the first treatment note dated January 9, 2007. (Tr. 540). On July 30, 2007, on a visit with Scott McKimm, D.O., at the Center, Plaintiff complained of low back pain on the left radiating into the legs, worse on the left. (Tr. 533). On examination, Plaintiff had no muscle spasm in the back, normal range of motion in the lumbosacral spine, no muscle weakness in his legs, and a normal gait and stance. (Tr. 534). There was no tenderness on palpation of the pelvic girdle, and motion did not elicit lumbosacral pain. (Tr. 534). An

MRI of Plaintiff's lumbar spine, dated July 27, 2007, showed a herniated disc at the L5-S1 level and minor discogenic disease at L3 through L5. (Tr. 564). There was no significant spinal stenosis in the lumbar spine. (Tr. 564).

On September 24, 2007, Plaintiff visited with Dr. McKimm, complaining of low back pain radiating to the left knee. (Tr. 531). On examination, he had no muscle spasms in his back, the lumbosacral spine appeared normal but exhibited tenderness on palpation. (Tr. 532). There was normal flexion and extension but rotation to the left and right was decreased. (Tr. 532). Motion elicited lumbosacral spine pain. (Tr. 532). Stance and gait were normal. (Tr. 532). There was no lower extremity weakness. (Tr. 532). The straight leg raising test was positive. (Tr. 532). Dr. McKimm diagnosed lumbago and radiculopathy. (Tr. 532). He prescribed pain medication. (Tr. 532).

On October 9, 2007, Plaintiff visited with Dr. McKimm, continuing to complain of low back pain. (Tr. 529). The lumbosacral spine appeared normal but exhibited tenderness on palpation. (Tr. 530). There were muscle spasms bilaterally. (Tr. 530). Lumbosacral spine flexion was normal but Plaintiff had difficulty raising back up from the flexed position. (Tr. 530).

On April 25, 2008, Plaintiff visited with Dr. McKimm for a "recheck" and review of test results. At that time, he complained of back pain. (Tr. 526). On May 5, 2008, Plaintiff visited with Dr. McKimm, complaining of low back pain. (Tr. 523). The lumbosacral spine exhibited tenderness on palpation but no muscle spasms. (Tr. 524). Flexion, extension and rotation were normal. (Tr. 524). Motion elicited no spinal pain.

(Tr. 524). In addition, gait and stance were normal and there was no lower extremity weakness. (Tr. 524).

Plaintiff was next seen at the Center on February 6, 2009, for a complaint of an abscessed tooth. (Tr. 521). On February 19, 2009, he visited for low back pain after falling on ice. On April 24, 2009, Kathy Fragale, a physician's assistant, completed a medical assessment form indicating Plaintiff's diagnoses were a disc herniation at the L2-L3 level, a disc herniation at the L5-S1 level and radiculopathy. On April 30, 2009, Fragale saw Plaintiff for a complaint of low back pain that "started last night" after he had mowed the grass the day before. (Tr. 517).

In the meantime, on April 23, 2009, Plaintiff treated with Ashok Kumar, M.D., a pain management specialist. Plaintiff stated that he had low back pain for seven months. (Tr. 402). The pain radiates into his left lower leg. (Tr. 402). It started insidiously; it is constant, sharp, and shooting in character. (Tr. 402). It interferes with certain activities of daily living. (Tr. 402). An MRI revealed disc herniation at L2-L3 causing minimal neural foraminal compromise and an L5-S1 paracetal disc herniation causing mild encroachment at the left lateral recess and left neural foramina. (Tr. 403). On examination, there was no spinal tenderness and no paraspinal muscle spasm. (Tr. 403). Straight leg raising was positive by 15 degrees on the left side and 45 degrees on the right. (Tr. 403). Range of motion in both flexion extension and lateral flexion was mildly limited due to pain. (Tr. 403). On June 19, 2009, Dr. Kumar gave Plaintiff an epidural injection at the L2-L3 level.

On May 15, and 29, 2009, and June 22, and 29, 2009, Plaintiff visited the Center for treatment of his low back pain and radiculopathy. (Tr. 510-516). On July 6, 2009, Plaintiff treated at the Center. He reported a throbbing back pain that radiated to the left buttock and pins and needles down the left leg. (Tr. 508). He stated that the epidural injection had not helped. (Tr. 508).

Plaintiff continued to treat at the Center through April 2011. He treated with Dr. Saira Bano, the physician who filled out an April 2011 medical source statement for Plaintiff, on June 16, 2010, (Tr. 689), July 13, 2010, (Tr. 686), July 27, 2010, (Tr. 684), and September 21, 2010. (Tr. 673). On August 26, 2009, a treatment note stated that Vicodin was working well. (Tr. 641). On October 12, 2009, Plaintiff received his third epidural injection but stated that the injections were not helping. (Tr. 632). An X-ray of the cervical spine on November 17, 2009, revealed normal alignment, no acute fracture and no significant degeneration. (Tr. 625). On August 10, 2010, Plaintiff reported that he was "doing good" and that he was "very active," although he had pain with more activity. (Tr. 682). On November 10, 2010, Plaintiff reported intermittent back spasms about two times per week. (Tr. 665). On February 22, 2011, Plaintiff reported continued lower back pain and left leg pain. (Tr. 656).

On October 5, 2010, Plaintiff consulted with Dr. Theresa Arvesen, M.D, a pain management specialist. He reported that his back and leg pain was anywhere between 5 and 10 on a ten-point scale an said it started in 2006 when he was playing with his son. (Tr. 598). He described the pain as sharp, aching and tingling. (Tr. 598). It

was decreased by taking medications.  (Tr. 598).  Lifting, walking and standing for long periods made it worse.  (Tr. 598).  A March 2009 MRI scan showed a tiny central disc herniation at L2-L3 with foraminal compromise and a left central disc herniation at L5-S1 encroaching on the left foraminal lateral recess.  (Tr. 598).  An X-ray of the spine showed a slight narrowing at the L5-S1 level and an X-ray of the pelvis was unremarkable.  (Tr. 598).

On examination, Plaintiff's gait and heel-and-toe ambulation were adequate.  (Tr. 599).  Muscle stretch reflexes were +2 throughout both lower extremities.  (Tr. 599).  Sensation to light touch was grossly intact.  (Tr. 599).  A straight leg raising test was equivalent.  (Tr. 599).  There was no pain with flexion but some with extension.  (Tr. 599).  There was no evidence of kyphosis or scoliosis.  (Tr. 599).  Patrick sign was negative.  (Tr. 599).  Quadrant loading was positive on the left.  (Tr. 599).  On November 17, 2010, Dr. Arvesen gave Plaintiff a left lumbar medial branch block.  (Tr. 596).

On August 25, 2009, V. Rao Nadella, M.D., performed a consultative examination for the Social Security Administration.  Plaintiff reported low back pain, apparently starting about a year previously.  (Tr. 578).  Plaintiff stated the pain is constant but more with standing, prolonged sitting, walking and going up the stairs.  (Tr. 578).  Plaintiff denied any history of numbness.  (Tr. 578).  On examination, there was no localized swelling or tenderness in the extremities.  (Tr. 580).  Movements and joints were basically within normal limits.  (Tr. 580).  There was normal motor power in all four extremities and on a scale of 0 to 5, the motor power was around 4 to 5.  (Tr. 580).

There was no evidence of atrophy, and reflexes were normal.  (Tr. 580).  The sensory system was within normal limits.  (Tr. 580).  Straight leg raising test was 90 degrees in the sitting position bilaterally and about 60 to 65 degrees on the right side and 45 degrees on the left side.  (Tr. 581).  His station was normal and his gait was slightly unsteady.  (Tr. 581).  He could perform fine and dexterous movements.  (Tr. 581).

On September 10, 2009, Janine M. Torda, a state agency reviewer, filled out a physical residual functional capacity assessment.  By checking the appropriate boxes on the form, Torda indicated Plaintiff could: occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand or walk for about six hours in an eight-hour day; and sit for about six hours in an eight-hour.  (Tr. 587).

On April 6, 2011, Dr. Bano filled out a medical source statement.  By checking the appropriate boxes on the form, Dr. Bano indicated Plaintiff could: occasionally lift and carry less than ten pounds; frequently lift and carry less than ten pounds; stand or walk for only one hour in an eight-hour day; sit for only one hour in an eight-hour day as long as he could alternate between sitting and standing every fifteen minutes; and that Plaintiff would be off task due to position changes for ten to fifteen minutes.  (Tr. 704-705).

Dr. Bano also noted that Plaintiff was limited in his ability to push or pull with his lower extremities; could never climb and could only occasionally perform other postural activities of balancing, kneeling, crouching, crawling or stooping; was limited in reaching in all directions (Tr. 705); and should not be exposed to vibrations.  (Tr. 706).

Dr. Bano opined that Plaintiff would likely call off work five days out of a five-day workweek; would be unable to complete five days out of a five-day workweek because of his medical conditions, and would be have to take more than nine medically required breaks in excess of five to ten minutes in an eight-hour workday. (Tr. 706).

III. *The ALJ's Decision*

In relevant part, the ALJ made the following findings. First, Plaintiff had "the following severe impairments: "degenerative disc disease of the lumbar spine; lumbago; a tiny central disc herniation at L2-3 causing minimal neural foraminal compromise; a small left paracentral disc herniation at L5-S1 encroaching on the left neural foramen; and a ventral hernia status post prior hernia repair." (Tr. 25). Second, Plaintiff "does not have an impairment or combination of impairments that meets or medically equals he severity of one of the listed impairments . . . ." (Tr. 25). Third, in relevant part:

> the claimant has the residual functional capacity to: lift and
> carry, push and pull, up to 20 pounds occasionally and 10
> pounds frequently; complete an eight-hour work day, five days
> per week, on a regular and continuing basis, but he requires a
> sit/stand option. He is able to sit for one hour at a time, stand
> for 15 minutes at a time, and walk for ten minutes at a time.
> He can only occasionally reach overhead, but can frequently
> reach in other directions. He can occasionally: climb;
> balance; stoop; kneel; crouch; crawl; and operate foot control
> pedals. . . .

(Tr. 32). Fourth, the claimant is able to perform his past relevant work as a sales attendant in a convenience store. (Tr. 37). Fifth, at thirty-one years old at the time of the alleged onset date of disability, the claimant was defined as a younger individual. Sixth,

the claimant has the equivalent of a high school education.  (Tr. 39).  Seventh, "[c]onsidering the claimant's age, education, past relevant work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can perform . . . ."  (Tr. 39).  Plaintiff could be a cashier II, a ticket seller, or vacuum plastic forming machine tender.  (Tr. 39).

In making these findings, the ALJ did not fully credit Plaintiff's testimony concerning his symptoms and limitations.  She found him only "partially credible" because his statements in that regard were "not supported by the objective medical evidence to the extent alleged."  (Tr. 34).  The ALJ then gave several reasons based on the medical record for reaching that conclusion.  (Tr. 34-35).

The ALJ then rejected Dr. Bano's assessment of Plaintiff's functional limitations for the following reasons: (1) the objective medical evidence did not support Dr. Bano's assessment; (2) the doctor's assessment appeared to be based largely on the claimant's subjective complaints, but in some respects, was inconsistent with Plaintiff's testimony concerning his functional limitations; (3) the record did not establish that Dr. Bano was Plaintiff's "treating physician for a significant part of the period at issue" (Tr. 36); (4) the report of the consultative medical examiner, Dr. Nadella, contains "clinical findings" showing "relatively minor clinical abnormalities," and "his report in conjunction with other objective medical examination findings by treating sources, provides a basis for concluding that [Dr. Bano's] limitations on the claimant's ability to sit, stand and walk, are not reasonably warranted."  (Tr. 36).

The ALJ then discussed the Torda physical residual functional capacity assessment. The ALJ did not fully credit this assessment because it was "not consistent with the objective medical evidence as a whole." (Tr. 37). The ALJ decided that Plaintiff could not occasionally lift fifty pounds and twenty-five pounds frequently, or frequently stoup or crouch. (Tr. 37). The ALJ decided instead that Plaintiff could only occasionally lift twenty pounds and frequently lift ten pounds, which qualified him for a restricted range of light work.

IV. *Standard of Review*

The Appeals Council's denial of Plaintiff's request for review means the ALJ's decision is the decision of the Commissioner. *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007). It is therefore the ALJ's decision we review. In doing so, we review the ALJ's application of the law de novo, *id., and* we review the ALJ's factual findings to see if they are supported by substantial evidence. *Id.* (citing in part 42 U.S.C. § 405(g)). Generally, substantial evidence has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)(quoted case omitted). It is "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoted case omitted).

We must uphold factual findings supported by substantial evidence. *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001). It follows "that we are not permitted to weigh the evidence or substitute our own conclusions for that of the fact-

finder." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Put another way, we cannot reverse the Commissioner's decision simply because we might "have decided the factual inquiry differently." *Fargnoli, supra,* 247 F.3d at 38.

V. *Discussion*

  A*. The ALJ Did Not Substitute her Lay Opinion For that of the Medical Experts and Properly Cited to Objective Medical Evidence in the Record to Support Her Conclusion that Plaintiff Was Not Disabled*

Plaintiff's first two claims are that: (1) the ALJ relied on her own lay opinion of the medical evidence rather than on the opinions of the medical professionals appearing in the record; and (2) the ALJ did not identify the medical evidence she relied on in reaching her conclusion Plaintiff was not disabled.

An ALJ "may not employ her own expertise against that of a physician who presents competent medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). Nor may an ALJ rely on her own lay analysis of the medical records. *Cruz v. Colvin*, No. 12-CV-0135, 2013 WL 5299166, at *21 (M.D. Pa. Sept. 17, 2013)(Caldwell, J.)(citing in part *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990)). The ALJ must also discuss the evidence specifically and indicate the evidence she accepted, the evidence she rejected and her reasons for doing so. *See Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981).

We disagree with Plaintiff on both claims. The ALJ comprehensively reviewed the medical evidence (our summary of the medical evidence mirrors that of the

ALJ) and noted there were "no significant clinical findings." (Tr. 29). This is a reference to findings like no impairment of motor function in the lower extremities, normal station and gait, normal reflexes, normal range of motion or only a slightly decreased range of motion. The ALJ referred to these "minimal abnormal clinical findings" in discussing Dr. Kumar's report (Tr. 30) and again referred to "minor abnormal signs" when discussing Dr. Arvesen's report. (Tr. 31). An ALJ can rely on such clinical findings in making her residual functional capacity determination. *See Schmidt v. Commissioner*, 465 F. App'x 193, 196 (3d Cir. 2012)(nonprecedential). We note also the ALJ's reference to Dr. Arvesen's note that Plaintiff's pain was decreased by taking medications (Tr. 30) and Plaintiff's August 2010 report that he was "doing good" and that he was "very active," although he had pain with more activity. We therefore reject Plaintiff's arguments that the ALJ improperly relied on her own lay opinion and that she did not identify the medical evidence of record supporting her conclusion.

    B. *The ALJ Did Not Improperly Reject the Opinion of Dr. Bano,*
       *a Treating Physician*

Plaintiff argues that the ALJ improperly rejected the opinion of her treating physician, Dr. Bano's April 2011 medical source statement, asserting that Dr. Bano's opinion is not contradicted by other medical evidence in the record. Plaintiff also takes issue with the ALJ's reasons for not accepting Dr. Bano's opinion.

We disagree. Great weight must be afforded the opinion of treating physicians, especially "'when their opinions reflect expert judgment based on a continuing

observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)(quoted case omitted).  Nonetheless, an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."  *Id.*  An ALJ may also reject a treating physician's opinion on the basis of contrary medical evidence.  *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  Here, the ALJ reasonably concluded that Dr. Bano's opinion did not have to be given great weight because it was based on Plaintiff's report of his limitations, not on an explanation of Dr. Bano's medical findings.  *See also Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)("Form reports in which a physician's obligation is only to check a box in a blank are weak evidence at best.").

Also, as discussed above, the ALJ relied on contrary medical evidence in discounting Dr. Bano's opinion.[3]

       We will issue an appropriate order.

       /s/William W. Caldwell
       William W. Caldwell
       United States District Judge

Date: February 24, 2014

---

[3] We have considered Plaintiff's other arguments on this issue and do not find them persuasive.